E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ROGER A. HSIEH (Cal. Bar No. 294195)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
MATT COE-ODESS (Cal. Bar No. 313082)
Assistant United States Attorney
General Crimes Section
       1100/1200 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012
       Telephone: (213) 894-0600/8957
       Facsimile: (213) 894-6265
       E-mail: Roger.Hsieh@usdoj.gov
               Matt.Coe@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

             FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>NITA ALMUETE PADDIT PALMA,<br>  aka "Nita Catbagan," and<br>PERCY DEAN ABRAMS<br><br>          Defendants. | No. CR 2:20-00536-DMG<br><br>TRIAL MEMORANDUM<br><br>Trial Date:  December 3, 2024<br>Trial Time:  8:30 a.m.<br>Location:    Courtroom of the<br>             Hon. Dolly M. Gee |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California, and Assistant United States Attorneys Roger A. Hsieh and
Matt Coe-Odess, hereby files its Trial Memorandum for the above-
captioned case.

//

This Trial Memorandum is based upon the attached memorandum of points and authorities, the files and records in this case, and further evidence and argument as the Court may permit.

Dated: November 26, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

      /s/
ROGER A. HSIEH
MATT COE-ODESS
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## **TABLE OF CONTENTS**

DESCRIPTION                                                                        PAGE

TABLE OF AUTHORITIES...............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   FACTUAL SUMMARY..............................................2

      A.    Defendant PALMA's Exclusion from Medicare and
            Requirements for Billing Hospice to Medicare.............2

      B.    Defendant PALMA Owns and Operates Magnolia Gardens
            Hospice and C@A Hospice Despite Her Exclusion From
            Medicare................................................4

      C.    Defendant PALMA Pays Illegal Kickbacks to Marketers,
            Including Defendant ABRAMS, for Hospice Referrals........4

      D.    Defendant PALMA Prevents the Discharge of Patients
            that Do Not Qualify for Hospice and Defendant PALMA
            Instructs Employees to Falsify Patient Charts in
            Response to ADRs........................................5

      E.    Law Enforcement Executes Search Warrants at Magnolia,
            C@A, and Email Accounts Belonging to Defendant PALMA......6

      F.    The Beneficiaries Did Not Qualify for Hospice and
            Generally Did Not Know They Were Billed to Medicare
            for Hospice............................................7

      G.    Defendant ABRAMS' Statements to Law Enforcement and to
            Beneficiary T.N........................................8

III.  STATEMENT OF THE CHARGES......................................8

IV.   THE GOVERNMENT'S CASE-IN-CHIEF..............................11

V.    PROCEDURAL HISTORY..........................................11

VI.   ANTICIPATED LEGAL AND EVIDENTIARY ISSUES....................14

      A.    Authentication and Foundation..........................14

      B.    Admissibility of Defendants' Statements................16

            1.    The Government May Introduce Defendants'
                  Statements and Related Questions/Statements under
                  Applicable Hearsay Rules.........................16

### TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                                    PAGE

        2.   Defendants May Not Introduce Their Own Out-Of-Court Statements into Evidence......................17

  C.  Lay Law Enforcement Testimony...........................19

  D.  Expert/Non-Expert Testimony.............................21

  E.  Evidence Regarding Defendant PALMA's Conviction and C@A.....................................................22

  F.  Character Witnesses.....................................23

  G.  Proposed Testimony as to Defendant ABRAMS' Intent.......24

  H.  Summary Exhibits........................................25

  I.  Cross-Examination of Defendant..........................27

  J.  Asset Forfeiture........................................28

  K.  Reciprocal Discovery....................................28

VII. CONCLUSION.................................................29

APPENDIX A: Joint Trial Witness Time Estimate Form.................1

ii

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                  PAGE

**Cases**

Bryan v. United States,
  524 U.S. 184 (1988) ................................................ 9

Gallego v. United States,
  276 F.2d 914 (9th Cir. 1960) ..................................... 15

Michelson v. United States,
  335 U.S. 469 (1948) .............................................. 23

United States v. Aceves-Rosales,
  832 F.2d 1155 (9th Cir. 1987) ................................... 28

United States v. Anderson,
  813 F.2d 1450 (9th Cir. 1987) ................................... 21

United States v. Barragan,
  871 F.3d 689 (9th Cir. 2017) .................................... 20

United States v. Black,
  767 F.2d 1334 (9th Cir. 1985) .............................. 15, 27

United States v. Chu Kong Yin,
  935 F.2d 990 (9th Cir. 1991) .................................... 15

United States v. Collicott,
  92 F.3d 973 (9th Cir. 1996) ..................................... 17

United States v. Cuozzo,
  962 F.2d 945 (9th Cir. 1992) .................................... 27

United States v. De Peri,
  778 F.2d 963 (3d Cir. 1985) ..................................... 26

United States v. Fernandez,
  839 F.2d 639 (9th Cir. 1988) .................................... 18

United States v. Gadson,
  763 F.3d 1189 (9th Cir. 2014) ................................... 20

United States v. Gardner,
  611 F.2d 770 (9th Cir. 1980) .................................... 26

United States v. Gay,
  967 F.2d 322 (9th Cir. 1992) .................................... 27

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                        <u>PAGE</u>

<u>United States v. Gomez</u>,
   6 F.4th 992 (9th Cir. 2021) ...................................... 24

<u>United States v. Harrington</u>,
   923 F.3d  (9th Cir. 1991) ....................................... 15

<u>United States v. Hedgcorth</u>,
   873 F.2d 1307, 1309 (9th Cir. 1989) ............................ 23

<u>United States v. Herman</u>,
   997 F.3d 251 (5th Cir. 2021) .................................... 18

<u>United States v. Holguin</u>,
   51 F.4th 841 (9th Cir. 2022) .................................... 19

<u>United States v. Meyers</u>,
   847 F.2d 1408 (9th Cir. 1988) ............................... 25, 26

<u>United States v. Mitchell</u>,
   502 F.3d 931 (9th Cir. 2007) .................................... 18

<u>United States v. Moreno</u>,
   243 F.3d 551 (9th Cir. 2000) .................................... 21

<u>United States v. Nash</u>,
   115 F.3d 1431 (9th Cir. 1997) ................................... 29

<u>United States v. Ortega</u>,
   203 F.3d 675 (9th Cir. 2000) ........................... 16, 17, 18

<u>United States v. Pino-Noriega</u>,
   189 F.3d 1089 (9th Cir. 1999) ................................... 20

<u>United States v. Rubino</u>,
   431 F.2d 284 (6th Cir. 1970) .................................... 26

<u>United States v. Scales</u>,
   594 F.2d 558 (6th Cir. 1979) ............................... 25, 26

<u>United States v. Scholl</u>,
   166 F.3d 964 (9th Cir. 1999) .................................... 29

<u>United States v. Skeet</u>,
   665 F.2d 983 (9th Cir. 1982) .................................... 20

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Smith,
  893 F.2d 1573 (9th Cir. 1990) ...................................... 15

United States v. Taylor,
  716 F.2d 701 (9th Cir. 1983) ....................................... 15

United States v. Torres,
  794 F.3d 1053 (9th Cir. 2015) ...................................... 16

United States v. Vallejos,
  742 F.3d 902 (9th Cir. 2014) ................................... 17, 18

United States v. VonWillie,
  59 F.3d 922 (9th Cir. 1995) ........................................ 20

**Statutes**

18 U.S.C. § 2(b) ............................................... 2, 9, 11
18 U.S.C. § 982(a)(7) .............................................. 28
18 U.S.C. §§ 1347(a)(2) ........................................ 2, 8, 9
42 U.S.C. § 1320a-7b(f) ............................................ 10

**Rules**

Fed. R. Crim. P. 16 ................................................ 28
Fed. R. Evid. 1003 ................................................. 15
Fed. R. Evid. 1006 ................................................. 25
Fed. R. Evid. 106 .................................................. 17
Fed. R. Evid. 404 .................................................. 27
Fed. R. Evid. 608 .................................................. 23
Fed. R. Evid. 611 .................................................. 26
Fed. R. Evid. 701 .................................................. 21
Fed. R. Evid. 702 .................................................. 21
Fed. R. Evid. 703 .................................................. 22
Fed. R. Evid. 801 .............................................. 16, 17
Fed. R. Evid. 803 .................................................. 17
Fed. R. Evid. 901 .................................................. 16
Fed. R. Evid. 902 .................................................. 15

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3      While excluded from Medicare for felony state and federal

4   kickback convictions, defendant NITA ALMUETE PADDIT PALMA purchased

5   Magnolia Gardens Hospice through a straw owner in July 2015 while she

6   was on supervised release for her 2009 federal convictions.

7   Defendant PALMA fraudulently billed Medicare more than $3.2 million

8   in purported hospice services -- which required that the beneficiary

9   be certified as terminally ill with a life expectancy of six months

10  or less -- from 2015 to 2017 and was paid by Medicare into a bank

11  account that she controlled.  Defendant PALMA paid illegal kickbacks

12  to marketers -- including to defendant PERCY DEAN ABRAMS -- for

13  beneficiary referrals on a per patient basis without regard to

14  whether the beneficiaries qualified for hospice care.

15     Defendant PALMA kept track of payments she owed to marketers,

16  including defendant ABRAMS, in notebooks that were seized during the

17  execution of search warrants in June 2017.  Defendant ABRAMS admitted

18  on an undercover video that he knew offering a kickback was illegal.

19  In a separate recorded interview with law enforcement, defendant

20  ABRAMS acknowledged that he worked at multiple hospices; that the

21  anti-kickback statute was "up on the wall"; that "[a]nytime you

22  market, in any field, you know, you have to be aware of that"; and

23  that the companies provided him training on the anti-kickback

24  statute, which defendant ABRAMS said the companies were legally

25  required to do.

26     In response to Additional Document Requests from Medicare for

27  claims submitted by Magnolia for purported hospice services,

28

defendant PALMA had a meeting with employees in which she and her husband instructed employees to "fix" or falsify patient charts, which may have included backdating charts and adding physician signatures to documents that were not there before.  Law enforcement found evidence of falsified patient charts when conducting the search warrants.

For their actions, (1) defendant PALMA is charged with twelve counts of health care fraud in violation of 18 U.S.C. §§ 1347(a)(2), 2(b) (Counts 1-12, with claim submission dates in 2015 and 2016); (2) defendant PALMA is charged with sixteen counts of offering or paying illegal remunerations for health care referrals in violation of 42 U.S.C. § 1320a-7b(b)(2)(a), 18 U.S.C. § 2(b) (Counts 13-28); and (3) defendant ABRAMS is charged with six counts of receiving illegal remunerations for health care referrals in violation 42 U.S.C. § 1320a-7b(b)(1)(a) (Counts 29-34).  Defendant PALMA is detained after her bond was revoked for committing additional health care fraud while on release, and defendant ABRAMS is released on bond.

## II.   FACTUAL SUMMARY[1]

At trial, the government intends to prove the following facts, among others:

### A.   Defendant PALMA's Exclusion from Medicare and Requirements for Billing Hospice to Medicare

Medicare is a federal health care program that provided benefits to individuals who were 65 years and older or disabled.  Individuals

---

[1] Pursuant to the Court's standing order, the government and defense conferred regarding the factual summary.  Counsel for defendant PALMA does not take a position on the factual summary, and this section reflects the government's view only as to defendant PALMA.  Counsel for defendant ABRAMS does not agree with the government's view of the factual summary regarding defendant ABRAMS' statements to law enforcement and to beneficiary T.N.

2

who qualified for Medicare benefits are referred to as Medicare "beneficiaries."  As alleged in the indictment, defendant PALMA was excluded from participating in the Medicare program beginning in or around November 1997.  Her exclusion was never terminated, and she was never reinstated in the Medicare program.  The Department of Health and Human Services ("HHS") notified defendant PALMA of her Medicare exclusions in or around 1997 and 2011.  Defendant PALMA's 2011 exclusion resulted from her federal convictions for receiving illegal kickbacks in or around November 2009.  The federal indictment alleged that defendant PALMA was excluded for participating in the Medicare program.  Defendant PALMA's Medicare exclusion prevents her from working in any capacity that supports the production of a claim to Medicare.

To qualify for reimbursement for hospice services, Medicare required: (1) a physician to certify that the beneficiary was terminally ill, meaning a life expectancy of six months or less if the beneficiary's illness ran its normal course; and (2) the beneficiary to sign an election form statement choosing hospice care instead of other Medicare benefits.  Hospice services reimbursed by Medicare were palliative in nature and included, but were not limited to, medications to manage pain symptoms, necessary medical equipment, and bereavement services to surviving family members.  Once a beneficiary chose hospice care, Medicare would not cover treatment intended to cure the beneficiary's terminal illness.  Medicare would not pay for claims that were procured by kickbacks or those that were medically unnecessary.

After a claim was submitted, Medicare can perform an Additional Document Request ("ADR") to determine whether a claim was in

1    compliance with Medicare's policies.  Through an ADR, Medicare

2    requests documentation from a provider to support specific claims.

3    After review of the documentation, Medicare issues findings as to

4    whether the claims are supported by the documentation provided.

5    **B.    Defendant PALMA Owns and Operates Magnolia Gardens Hospice and C@A Hospice Despite Her Exclusion From Medicare**

6

7         Defendant PALMA was aware of her exclusion from Medicare and

8    purchased Magnolia Gardens Hospice ("Magnolia") through a straw

9    purchaser -- her daughter, Michelle Vargas -- in or around July 2015.

10   Defendant PALMA signed an agreement purchasing Magnolia from Goar

11   Karapetyan and signed her own name on the purchase agreement.  For

12   documents submitted to Medicare, such as Magnolia's provider

13   enrollment form, defendant PALMA listed Michelle Vargas as the

14   purported owner or CEO of Magnolia.  Defendant PALMA told Ms. Vargas

15   that PALMA could not be listed on documents because of her "history."

16   Defendant PALMA also owned and operated C@A Hospice ("C@A"), and she

17   used checks from C@A to purchase Magnolia.  Defendant PALMA

18   controlled the business bank accounts for both Magnolia and C@A, and

19   these business bank accounts received electronic payments from

20   Medicare for purported hospice services provided to beneficiaries.

21   **C.    Defendant PALMA Pays Illegal Kickbacks to Marketers, Including Defendant ABRAMS, for Hospice Referrals**

22

23        To obtain beneficiaries to bill to Medicare for purported

24   hospice services through Magnolia and C@A, defendant PALMA paid

25   marketers illegal kickbacks of up to $1,000 per patient per month

26   that the beneficiary remained on hospice care, regardless of whether

27   the beneficiary qualified for hospice services.  Defendant PALMA paid

28   numerous marketers -- including defendant ABRAMS, M.P., and others --

4

for hospice referrals.  These marketers understood defendant PALMA owned both Magnolia and C@A -- which were less than a mile away from each other -- and that she used the two hospices interchangeably. For example, at times, defendant PALMA would use checks from C@A to pay illegal kickbacks to marketers for beneficiary referrals to Magnolia and vice versa.  Defendant ABRAMS used patient intake sheets that listed both Magnolia and C@A.  Defendant PALMA also tracked payments that she owed to marketers on a per patient basis through handwritten composition books.  She kept the handwritten composition books tracking payments owed for Magnolia referrals at C@A. Defendant PALMA instructed marketer M.P. not to tell potential beneficiaries that they would be signed up for hospice because the patients would falsely think that they were dying.

### D. Defendant PALMA Prevents the Discharge of Patients that Do Not Qualify for Hospice and Defendant PALMA Instructs Employees to Falsify Patient Charts in Response to ADRs

Defendant PALMA appeared in person at both Magnolia and C@A on a regular basis.  Employees understood defendant PALMA and her husband Adolfo Catbagan to own both Magnolia and C@A.

At interdisciplinary team meetings, Magnolia staff members (including a physician) would review whether beneficiaries were appropriate for hospice.  After Dr. Evelyn Basco found that certain beneficiaries were not eligible for hospice, defendant PALMA yelled at Dr. Basco and asked how defendant PALMA would make payroll if all the patients were discharged.  In a January 2016 text message, Dr. John Thropay told defendant PALMA that, "[t]here are ongoing problems w marketers and nurses some of whom are admitting pts who don't qualify."  When defendant PALMA asked for patient names, Dr. Thropay responded with patient names including, "[S.H.]: she is very healthy,

running down steps in her home ... she said putting her on hospice is an abuse." Beneficiary S.H. continued to be billed to Medicare for purported hospice services after defendant PALMA received that text message.

From 2015 through 2017, Medicare performed three ADRs with Magnolia, requesting additional documentation to support beneficiary claims for purported hospice services. In response, defendant PALMA had a meeting with employees in which she and her husband instructed employees to "fix" or falsify patient charts, which may have included backdating charts and adding a physician's signature to documents that were not there before. Dr. Daniel Linares saw Certificates of Terminal Illness in Magnolia's electronic medical record that he did not sign but contained his electronic signature. Medicare ultimately denied over 98 percent (266 of 270) of the Magnolia claims it reviewed as part of the three ADRs.

### E. Law Enforcement Executes Search Warrants at Magnolia, C@A, and Email Accounts Belonging to Defendant PALMA

In or around June 2017, law enforcement executed search warrants at Magnolia, C@A, and on two email accounts belonging to defendant PALMA. Outside C@A, defendant PALMA was approached by law enforcement, HHS-OIG Special Agent Niall Bernard, and acknowledged that she was excluded from Medicare but lied about her association with C@A:

| | | |
|---|---|---|
| SA Bernard: | Oh okay. So you don't work there? |
| Nita Palma: | No |
| SA Bernard: | Oh okay, because you know your excluded, right? You know, you can't . . . |
| Nita Palma: | Yea, I know |

| | |
|---|---|
| SA Bernard: | ... so you know you can't participate ... |
| Nita Palma: | yea |
| SA Bernard: | ... in any kind of healthcare ... |
| Nita Palma: | yes, yes, yes, yes |
| SA Bernard: | whatsoever or anything like that |

At C@A, law enforcement found a composition notebook that tracked the kickback payments owed to defendant ABRAMS by defendant PALMA, which included beneficiaries referred to Magnolia.  There were also payroll records for both Magnolia and C@A found at C@A. Consistent with defendant PALMA's instructions to falsify or "fix" patient charts in response to Medicare's ADR, law enforcement found medical records with a physician's signature taped on and other charts that were manipulated with apparently doctored information.

### F.    The Beneficiaries Did Not Qualify for Hospice and Generally Did Not Know They Were Billed to Medicare for Hospice

Beneficiaries D.J.C., J.P.G., W.M., and T.N. will testify that they have never been terminally ill, including during the timeframe for which Magnolia billed them to Medicare for purported hospice services.  Some of the beneficiaries walked their dogs, travelled, and drove cars from 2015 to 2017, and some still do today.  The beneficiaries also will testify that they were at least initially generally unaware that they were signed up for hospice care.  Doctors who provided care to these beneficiaries -- including for beneficiaries that died years after the indictment, M.D., A.H., S.H., E.W. -- will testify that based on their evaluation of the beneficiaries and medical records, there is no indication that any of

the beneficiaries was terminally ill from 2015 to 2017 or that they were appropriate for hospice care.

### G.   Defendant ABRAMS' Statements to Law Enforcement and to Beneficiary T.N.

Defendant ABRAMS was a marketer and referred patients to numerous hospices, including Magnolia and C@A.  Law enforcement interviewed defendant ABRAMS, who at first claimed he was a "consultant" for Magnolia and C@A.  Defendant ABRAMS initially refused to acknowledge that he received payments on a per-patient basis for patient referrals to Magnolia and C@A and instead said he "strictly was doing marketing."  Defendant ABRAMS also stated that he was trained on the anti-kickback statute.

In an undercover recording with law enforcement and beneficiary T.N., defendant ABRAMS said he would pay for hospice referrals but that "[i]t's illegal for me to do that. . . . they would put me under the jail . . . if they found out I was doing it."  Defendant ABRAMS assured T.N. that she would not get in trouble for receiving a kickback because he would "give [her] cash money."

## III. STATEMENT OF THE CHARGES[2]

A grand jury returned an indictment on October 30, 2020, charging (1) defendant PALMA with twelve counts of health care fraud in violation of 18 U.S.C. §§ 1347(a)(2), 2(b) (Counts 1-12); (2) defendant PALMA with sixteen counts of offering or paying illegal remunerations for health care referrals in violation of 42 U.S.C.

---

[2] Pursuant to the Court's standing order, the government and defense conferred regarding the statement of charges.  Counsel for defendant PALMA does not take a position on the statement of the charges, and this section reflects the government's view only as to defendant PALMA.  Counsel for defendant ABRAMS agrees with the statement of charges as articulated in the following section.

§ 1320a-7b(b)(2)(a), 18 U.S.C. § 2(b) (Counts 13-28); and (3) defendant ABRAMS with six counts of receiving illegal remunerations for health care referrals in violation 42 U.S.C. § 1320a-7b(b)(1)(a) (Counts 29-34).

For defendant PALMA to be guilty of Counts 1-12, health care fraud, in violation of 18 U.S.C. §§ 1347(a)(2), the government must prove each of the following beyond a reasonable doubt:

(1) the defendant knowingly[3] and willfully[4] executed or attempted to execute a scheme or plan to defraud a health care benefit program[5] or obtain money or property owned by or under the custody and control of a health care benefit program by means of material false or fraudulent pretenses, representations, or promises;

(2) the defendant acted with the intent to defraud[6];

(3) Medicare was a health care benefit program; and

---

[3] An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. Ninth Circuit Model Criminal Jury Instructions, [Knowingly] No. 4.8 (2022 ed.).

[4] An act is done willfully if the defendant acted with a bad purpose, that is, with knowledge that the defendant's conduct was, in a general sense, unlawful. The government need not prove that the defendant was aware of the specific provision of the law that rendered the defendant's conduct unlawful. Ninth Circuit Model Criminal Jury Instruction, No. 4.6 [Willfully] (2022 ed.); Bryan v. United States, 524 U.S. 184, 190-91 (1988)

[5] "Health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract. Ninth Circuit Model Criminal Jury Instructions, No. 15.42 (2022 ed.) [Health Care Fraud – Health Care Benefit Program].

[6] An intent to defraud is an intent to deceive and cheat. Ninth Circuit Model Criminal Jury Instruction, No. 4.13 [Intent to Defraud] (2022 ed.)

9

(4) the scheme or plan was executed in connection with the delivery of, and payment for health care benefits, items, or services.

For defendant PALMA to be guilty of Counts 13-28, offering or paying illegal remunerations for health care referrals, in violation of 42 U.S.C. § 1320a-7b(b)(2)(a), or for defendant ABRAMS to be guilty of Counts 29-34, receiving illegal remunerations for health care referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(a), the government must prove each of the following beyond a reasonable doubt:

(1) the defendant knowingly and willfully[7] [offered/received][8] money;

(2) the money was [offered/received] and at least one purpose of the payment was to induce or in exchange for the referral of a patient insured by Medicare for arranging for the furnishing of an item or service;

(3) the patient's items or services arranged to be furnished were covered, in whole or in part, by Medicare; and

(4) Medicare is a federal health care program.[9]

For both Counts 1-12 (health care fraud) and Counts 13-28 (offering or paying illegal remunerations for health care referrals), defendant PALMA is also charged with aiding abetting in violation of

---

[7] "Knowingly" and "Willfully" have the same definitions as noted above for health care fraud.

[8] Throughout these instructions, "offered" applies to defendant PALMA and "received" applies to defendant ABRAMS.

[9] "Federal health care" program means any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government.  42 U.S.C. § 1320a-7b(f) ("Federal Health Care Program" Defined).

18 U.S.C. § 2(b).  Under 18 U.S.C. § 2(b), defendant PALMA may be found guilty of the crimes charged in Counts 1-28 even if the defendant did not personally commit the acts constituting the crime if the defendant willfully caused an act to be done that if directly performed by her would be an offense against the United States.  A defendant who puts in motion or causes the commission of an indispensable element of the offense may be found guilty as if she had committed this element herself.  Ninth Circuit Model Criminal Jury Instructions, No. 4.2 (2022 ed.) [Aiding and Abetting (18 U.S.C. § 2(b)].

## IV.  THE GOVERNMENT'S CASE-IN-CHIEF

The government anticipates that its case-in-chief will last approximately six full court days, including cross-examination.  The government plans to call approximately 25 witnesses in its case-in-chief as noted in the Joint Trial Witness Estimate form, attached hereto as Appendix A.[10]

Counsel for defendant ABRAMS' time estimates for the cross-examination of the government's witnesses are included in the Joint Trial Witness Estimate form.

## V.  PROCEDURAL HISTORY

Defendant PALMA was charged in 2020 with a $3.2 million health care fraud scheme involving purported hospice patients and kickbacks and defendant ABRAMS was charged with receiving kickbacks.  (Dkt. 1.)

---

[10] This list includes the witnesses the government currently may call at trial.  The government reserves its right to not call witnesses on this list or to call additional witness, as needed, including in its rebuttal case.  The government may remove witnesses as needed if stipulations are reached regarding authenticity and foundation with counsel for both defendants.

After her January 2021 arrest in this case, Deputy Federal Public Defender Carel Ale represented defendant PALMA. (Dkt. 11.) Several months later, defendant PALMA obtained her second counsel of record in this case, Harland Braun. (Dkt. 47.) After Mr. Braun suffered a medical issue, defendant PALMA obtained her third counsel in this case, Robert Hankoff. (Dkt. 119.) While on pre-trial release in this matter, defendant committed a new $4.8 million hospice fraud scheme (Dkt. 99) and was ordered detained pending trial (Dkt. 117).

After her detention, defendant PALMA obtained her fourth counsel in this case, Sara Azari. (Dkt. 123.) Shortly thereafter, defendant PALMA once again obtained new counsel, Jerry Friedberg and Margarette Mow, the fifth set of counsel to represent her. (Dkts. 126-27.) After much back-and-forth, which included rescheduling another matter, the government, counsel for defendant PALMA, and counsel for co-defendant ABRAMS decided to proceed to trial on October 8, 2024. The Court continued the trial to that date at the parties' request. (Dkt. 129.)

On June 25, 2024, the government sent a term sheet to Mr. Friedberg to resolve defendant PALMA's current case and the new fraud she committed while on pre-trial release with a response deadline of July 8, 2024. The day after the deadline had passed, defendant PALMA sought her sixth counsel in this matter. (Dkt. 132 at 8, ¶¶ 5-6.) On July 9, 2024, the government reiterated to defendant PALMA's counsel that it intended to proceed to trial on October 8, 2024, and requested the name of any new counsel for defendant PALMA. Having not heard from any new counsel for defendant PALMA, the government sent a letter to defendant PALMA's counsel of record on July 31,

1   2024, emphasizing the government's intent to proceed to trial on
2   October 8, 2024.  (Dkt. 135-1.)

3       Mr. Friedberg filed a motion for an order granting leave to
4   withdraw as counsel for defendant PALMA on July 31, 2024.  (Dkt.
5   132.)  At the September 3, 2024, hearing, the Court stated that if
6   defendant PALMA did not timely retain new counsel, the Court would
7   appoint counsel for Palma and that the trial intended to proceed on
8   the agreed upon date of December 3, 2024.  (Dkt. 146.)

9       Mr. Paul Aquino emailed the government requesting Brady
10  materials on or about September 6, 2024 on behalf of defendant PALMA.
11  Prior to Mr. Aquino's filing a notice of appearance on behalf of
12  defendant PALMA, the government noted that it intended to proceed to
13  trial on the December 3, 2024, trial date.  Mr. Aquino filed a
14  request to substitute as counsel for defendant PALMA on September 9,
15  2024 (Dkt. 145).  The Court granted that request, and Mr. Aquino was
16  appointed sole lead counsel for defendant PALMA (Dkt. 150).  Mr.
17  Aquino filed an opposition (Dkt. 173) to the government's motion in
18  limine to admit evidence of defendant PALMA's prior convictions and
19  evidence regarding C@A Hospice (Dkt. 152).  Mr. Aquino's opposition
20  was partially successful, as the Court excluded evidence of defendant
21  PALMA's 1994 convictions at trial.  (Dkt. 189.)

22      As the government mentioned during the November 20, 2024, pre-
23  trial conference, the government informed Mr. Aquino multiple times -
24  - through emails, phone calls, and an in-person meeting -- that it
25  intended to proceed to trial on December 3, 2024, and that a plea
26  agreement with defendant PALMA was very unlikely.  The back-and-forth
27  between defendant PALMA and Mr. Aquino could be seen as further
28  efforts of defendant PALMA to purposefully delay the trial by

13

claiming that Mr. Aquino was retained for plea negotiations and that she had not yet obtained additional counsel to defend her at trial.[11] Just months before, it was claimed that defendant PALMA had irreconcilable differences with Mr. Friedberg at or around the time the government's deadline to respond to its term sheet to resolve this matter and defendant PALMA's new hospice fraud scheme.

After hearing argument from Mr. Aquino and defendant PALMA, the government, and counsel for defendant ABRAMS, the Court provisionally appointed CJA attorney Greg Nicolaysen as Advisory Counsel for defendant PALMA.  (Dkt. 188.)

## VI.    ANTICIPATED LEGAL AND EVIDENTIARY ISSUES[12]

### A.    Authentication and Foundation

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Under Rule 901(a), evidence should be admitted, despite any challenge, once the government makes a prima facie showing of authenticity or identification so "that a reasonable juror could find in favor of authenticity or identification . . . [because] the

---

[11] The government reserves it right to further contest or respond to inaccurate statements made by defendant PALMA or Mr. Aquino at the November 20, 2024, pre-trial conference.

[12] Pursuant to the Court's standing order, the government and defense conferred regarding the anticipated legal and evidentiary issues raised in the section below.  Counsel for defendant PALMA does not take a position on the anticipated legal and evidentiary issues, and this section reflects the government's view only as to defendant PALMA.  Counsel for defendant ABRAMS objects to certain portions of this section, including as noted below for Sections VI.A.2 and VI.G. The government understands that unless otherwise noted, defendant ABRAMS takes no position regarding the other portions of the anticipated legal and evidentiary issues.

14

1  probative force of the evidence offered is, ultimately, an issue for

2  the jury." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th

3  Cir. 1991) (citations and internal quotation marks omitted); see also

4  United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).

5      The government need not establish all links in the chain of

6  custody of an item or call all persons who were in a position to come

7  into contact with it. See Gallego v. United States, 276 F.2d 914,

8  917 (9th Cir. 1960). Alleged gaps in the chain of custody go to the

9  weight of the evidence rather than to its admissibility. See United

10 States v. Taylor, 716 F.2d 701, 711 (9th Cir. 1983); see also United

11 States v. Harrington, 923 F.3d 1371 (9th Cir. 1991). A duplicate is

12 admissible to the same extent as the original, unless there is a

13 genuine question as to the authenticity of the original or it would

14 be unfair under the circumstances to admit the duplicate in lieu of

15 the original. See Fed. R. Evid. 1003; United States v. Smith, 893

16 F.2d 1573, 1579 (9th Cir. 1990).

17     Federal Rule of Evidence 902 provides that certain evidence is

18 self-authenticating, including the original or a copy of a domestic

19 business record "as shown by a certification of the custodian or

20 another qualified person[.]" Fed. R. Evid. 902(11).

21     Based on a November 22, 2024, phone call with counsel for

22 defendant ABRAMS, the government understands that defendant ABRAMS

23 will not challenge the authenticity of evidence including recordings,

24 emails, text messages, and other documents. For defendant PALMA, the

25 government will continue to attempt to meet-and-confer regarding

26 foundation and other potential evidentiary issues. The government

27 will provide sufficient evidence so that a reasonable juror could

28 find "that the item is what the proponent claims it is" through

record certifications, testimony, and other evidence to meet the low threshold for authenticity.  Fed. R. Evid. 901(a).

**B.  Admissibility of Defendants' Statements**

At trial, the government will offer into evidence defendant PALMA and ABRAMS' testimony through recordings, emails, text messages, and witness testimony.  As discussed below, such statements are admissible.

1.  The Government May Introduce Defendants' Statements and Related Questions/Statements under Applicable Hearsay Rules

A defendant's statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay.  Fed. R. Evid. 801(d)(2); see United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).

Some of both defendant PALMA and ABRAMS' statements were made in response to a law enforcement officer's or another person's questions or statements.  Questions are non-hearsay when they are not intended to make any assertion.  See Fed. R. Evid. 801(c) (defining "hearsay" as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"); Fed. R. Evid. 801(a) (defining "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion"); cf. United States v. Torres, 794 F.3d 1053, 1059-60 (9th Cir. 2015) (explaining that "questions and inquiries may constitute non-hearsay" unless the question is intended "to communicate an implied assertion and the proponent offers it for this intended message").  Here, the questions provide context for each defendant's statements.  As discussed above,

1  defendants' statements in response to questioning are not hearsay

2  because they are the statement of a party-opponent.  See Fed. R.

3  Evid. 801(d)(2); Ortega, 203 F.3d 675, 682 (9th Cir. 2000).  Further,

4  under Fed. R. Evid. 803(3), a statement of the declarant's then-

5  existing state of mind (such as motive, intent, or plan) or emotional

6  condition is not excluded by the rule against hearsay.

7          2.   Defendants May Not Introduce Their Own Out-Of-Court
                Statements into Evidence

8

9       The government's admission of defendant's statements, however,

10  does not allow defendant to offer his own out-of-court statements

11  into evidence.  When offered by the defendant, such statements are

12  hearsay.  In Ortega, the Ninth Circuit held that non-self-inculpatory

13  statements, even if made contemporaneously with other self-

14  inculpatory statements, are inadmissible hearsay, and the rule of

15  completeness does not allow for admission of that inadmissible

16  hearsay.  203 F.3d at 682; see also United States v. Collicott, 92

17  F.3d 973, 983 (9th Cir. 1996) (otherwise inadmissible hearsay not

18  admitted regardless of Federal Rule of Evidence 106).

19       Additionally, the mere fact that the government may introduce

20  portions of defendant's recorded statement does not mean the full

21  statement must be admitted.  Under Rule 106, "[i]f a party introduces

22  all or part of a writing or recorded statement, an adverse party may

23  require the introduction, at that time, of any other part -- or any

24  other writing or recorded statement -- that in fairness ought to be

25  considered at the time."  Fed. R. Evid. 106 (emphasis added).  But

26  Rule 106 is interpreted narrowly and "does not . . . require the

27  introduction of any unedited writing or statement merely because an

28  adverse party has introduced an edited version."  United States v.

17

1    Vallejos, 742 F.3d 902, 905 (9th Cir. 2014).  A "complete statement"

2    is only required if it "serve[s] to correct a misleading impression

3    in the edited statement that is created by taking something out of

4    context."  Id.; see also, e.g., United States v. Herman, 997 F.3d

5    251, 264 (5th Cir. 2021), cert. denied, 142 S. Ct. 787 (2022) ("Rule

6    106 permits a party to correct an incomplete and misleading

7    impression created by the introduction of part of a writing or

8    recorded statement; it does not permit a party to introduce writings

9    or recorded statements to affirmatively advance their own,

10   alternative theory of the case.").

11       To permit either defendant to admit anything other than narrow

12   additions to prevent misleading impressions would place a defendant's

13   statements "before the jury without subjecting [himself] to cross-

14   examination, precisely what the hearsay rule forbids." Ortega, 203

15   F.3d at 682 (9th Cir. 2000) ("Even if the rule of completeness did

16   apply, exclusion of [the defendant's] exculpatory statements was

17   proper because these statements would still have constituted

18   inadmissible hearsay.") (internal citation omitted); United States v.

19   Mitchell, 502 F.3d 931, 964 (9th Cir. 2007) (district court properly

20   rejected defendant's attempts to admit testimony about statements he

21   made to law enforcement, reasoning that such statements were

22   inadmissible hearsay when defendant was attempting to elicit them).

23       This rule does not prevent defendant from presenting his or her

24   defense at trial, including by testifying.  Defendants are not

25   permitted to place any of his or her prior statements before the

26   Court without subjecting himself to cross-examination.  See Ortega,

27   203 F.3d at 682; United States v. Fernandez, 839 F.2d 639, 640 (9th

28   Cir. 1988) (per curiam).

18

Thus, defendant may not introduce his prior statements through defense witnesses or by cross-examining government witnesses with defendant's hearsay statements.

Defendant ABRAMS disagrees with the government's position. To the extent the government introduces a video recording of defendant ABRAMS stating that it was illegal to pay referrals for hospice, defendant ABRAMS intends to introduce different portions of the video recording in order to show additional statements made by defendant ABRAMS that he contends explain his motive for that gesture and illustrates his compassion for the financial suffering of families of sick individuals and places in context the statements (that Mr. Abrams believes the Government will play to prove the Government's theory of Mr. Abrams' motivations). Defendant ABRAMS contends that simply playing the portion of the video recording regarding the legality of paying kickbacks would suggest, improperly and out of context, that his motive was purely financial gain. Defendant ABRAMS also contends that Ortega is inapplicable because it concerned oral statements and does not apply to a video recording which is governed by Fed. R. Evid. 106.

### C.  Lay Law Enforcement Testimony

The United States plans to have HHS-OIG Special Agent Joshua Preuss act as an overview witness, who will likely discuss the course and scope of the investigation, including evidence obtained and reviewed and people interviewed. He will likely testify about how different things he learned or reviewed lead him to take additional investigative actions. Cf. United States v. Holguin, 51 F.4th 841, 865 (9th Cir. 2022), cert. denied, 143 S. Ct. 2509 (2023) (affirming, under plain error review, the admission of lay opinion testimony

19

about "the meaning of words and phrases encountered in the investigation" based on the officer's participation in searches, surveillance operations and arrests as part of the investigation).

Federal Rule of Evidence 701 "permits a lay witness to give opinion testimony as long as the opinion is (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." United States v. Pino-Noriega, 189 F.3d 1089, 1097 (9th Cir. 1999) (cleaned up).  Lay opinion testimony by law enforcement officers is admissible and is not necessarily expert testimony within the meaning of Rule 16(a)(1)(G).  See United States v. VonWillie, 59 F.3d 922, 929 (9th Cir. 1995) (admitting officer's testimony based on his training and experience about the nexus between drug trafficking and possession of weapons); see also United States v. Barragan, 871 F.3d 689, 703-04 (9th Cir. 2017) (agent's interpretation of conversation based upon direct knowledge constitutes lay testimony).  As the Ninth Circuit has explained, law enforcement officers' opinion testimony:

> is a means of conveying to the [trier of fact] what the witness has seen or heard . . . . Because it is sometimes difficult to describe the mental or physical condition of a person, his character or reputation, the emotions manifest by his acts; speed of a moving object or other things that arise in a day to day observation of lay witnesses; things that are of common occurrence and observation, such as size, heights, odors, flavors, color, heat, and so on; witnesses may relate their opinions or conclusions of what they observed.

United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982).

"[A]n investigator who has accumulated months or even years of experience with the events, places, and individuals involved in an investigation necessarily draws on that knowledge when testifying;

1   indeed, it is those out-of-court experiences that make the witness's
2   testimony helpful to the [trier of fact]." United States v. Gadson,
3   763 F.3d 1189, 1209 (9th Cir. 2014).  Rule 16 notice is not required
4   for the opinions of lay witnesses.  See Fed. R. Evid. 701; see also
5   United States v. Moreno, 243 F.3d 551, 551 (9th Cir. 2000).

6       Defendant ABRAMS has no objection provided that Special Agent
7   Preuss does not opine as to the intent or knowledge of defendant
8   ABRAMS, arguing that Special Agent Preuss lacks foundation.

9       **D.  Expert/Non-Expert Testimony**

10      On August 9, 2024, and August 30, 2024, the government provided
11  defense counsel with notice of two witnesses, Stacey Coleman and
12  Peter Clark, respectively.  To the extent the Court considers either
13  of these witnesses experts, the government provided disclosures to
14  the defense regarding these witnesses' qualifications and the
15  anticipated scope of their testimony under Rule 16.  The government
16  has not received notice of objection from either defendant regarding
17  these witnesses, and neither defendant filed a motion to exclude
18  either witness.  Ms. Coleman is a registered nurse and currently
19  works for a Medicare contractor as a lead claims analyst specializing
20  in Medicare reviews.  Ms. Coleman previously worked at various
21  hospices companies as a nurse and will provide the jury background
22  information on hospice and Medicare.  Mr. Clark is employed as Senior
23  Counsel, Special Exclusions Team of the Department of Health and
24  Human Services, Office of Counsel to the Inspector General.  Mr.
25  Clark will provide the jury background information on exclusions from
26  Medicare and information regarding defendant PALMA's exclusions from
27  Medicare.

28      A qualified expert witness may provide opinion testimony on a

fact at issue if specialized knowledge will assist the trier of fact. Fed. R. Evid. 702.  The Court has broad discretion to determine whether to admit expert testimony.  United States v. Anderson, 813 F.2d 1450, 1458 (9th Cir. 1987) (affirming district court decision to admit expert's testimony based on personal participation in over 50 drug sales).  Expert opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field.  Fed. R. Evid. 703.

### E.    Evidence Regarding Defendant PALMA's Conviction and C@A

The Court held that evidence of defendant PALMA's 2009 convictions "are highly probative of Palma's willfulness, an element of the Government's case." (Dkt. 189 at 7.)  At this time, the government intends to introduce evidence of the 2009 convictions, including the general nature of the allegations (defendant PALMA was charged with receiving illegal kickbacks in exchange for referring Medicare beneficiaries to a home health company and was excluded from Medicare at the time), the indictment alleged that defendant PALMA was "excluded from participation in the Medicare program", defendant PALMA was convicted of both counts (as noted through the judgment and commitment order), and these convictions led to a 2011 exclusion from Medicare.

The Court also held that certain evidence of defendant PALMA's involvement with C@A Hospice is admissible at trial.  At this time, the government intends to introduce evidence regarding C@A that support the allegations in the current indictment, including evidence seized from C@A Hospice during a search warrant (including a notebook tracking defendant ABRAMS' kickbacks), checks from C@A used to pay for kickbacks (including for Magnolia referrals), and general

evidence that defendant PALMA controlled C@A and some witnesses considered C@A and Magnolia to be interchangeable and worked at or for both hospices.

###     F.     Character Witnesses

Federal Rule of Evidence 608(a) permits attacks on a witness's credibility through testimony about the witness's general character or reputation for truthfulness or untruthfulness.  Fed. R. Evid. 608(a).  However, extrinsic evidence (including testimony from third party witnesses) about the witness's specific instances of conduct for the purpose of attacking the witness's character for truthfulness or untruthfulness is prohibited, except in the case of prior convictions.  Fed. R. Evid. 608(b).

Federal courts have explained that a criminal defendant "may introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged[,]" which include "the traits of 'honesty and truthfulness' and 'being a law-abiding citizen.'" Michelson v. United States, 335 U.S. 469, 475-78 (1948).  But the introduction of character evidence is not a free-for-all.  A criminal defendant must establish that the evidence being admitted is a "pertinent trait" tied to the offense.  For example, in United States v. Hedgcorth, the defendant was prosecuted for conspiracy to destroy property and use bombs.  873 F.2d 1307, 1309 (9th Cir. 1989).  The Ninth Circuit affirmed the "trial court's decision to foreclose inquiry into his role as an intelligence operative for the United States government and the legitimate use of the Mercenary Association in those operations" because "such evidence [was] inadmissible to the extent that it was offered to show that [the defendant] was a

'patriotic,' 'pro-government' individual unlikely to engage in acts of terrorism." 873 F.2d at 1313.

Rule 405 regulates the method for admitting a "pertinent trait" of character evidence. That is, "[w]hen evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."[13]

### G.    Proposed Testimony as to Defendant ABRAMS' Intent

Defendant ABRAMS has noticed that he intends to call a character witness on his behalf, Jeweline Miles. (Dkt. 163-1.)

On November 22, 2024, counsel for defendant ABRAMS stated that Ms. Miles may testify that defendant ABRAMS believed in tithing, a practice of donating one-tenth of one's income to a religious organization, which would purportedly be relevant to defendant ABRAMS' intent when he offered T.N. $100 payment for hospice referrals. Such testimony is improper and should not be admissible. First, Ms. Miles cannot testify about defendant ABRAMS' beliefs or state of mind because such testimony would be hearsay and not admissible under Rule 801 and 802. Ms. Miles could not possibly know what defendant ABRAMS believes or intended without someone, presumably defendant ABRAMS, having told her. Nor could Ms. Miles

---

[13] Under Rule 405(b), "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct." That Rule does not apply here. See, e.g., United States v. Gomez, 6 F.4th 992, 1004 (9th Cir. 2021) (discussing defense of "entrapment" as it applies to Rule 405(b)).

1  testify that she told Mr. Abrams to tithe.[14]  Second, defendant ABRAMS
2  is charged with receiving illegal kickbacks.  The government does not
3  currently understand how defendant ABRAMS' purported practice of
4  tithing has any bearing on whether he acted with the requisite intent
5  when he received payments for referring people to hospice.

6  Defendant ABRAMS disagrees with the government's position regarding
7  proposed testimony as to defendant ABRAMS' intent and argues that
8  should Ms. Miles testify, her advice to defendant ABRAMS is evidence
9  whether or not defendant ABRAMS had a specific intent and that there
10  is no prohibition on a witness stating that she told a defendant to
11  do something and why, provided it is relevant to the offense charged.
12  Defendant ABRAMS further notes that no authority is cited in support
13  of the Government's position and Ms. Abrams is not aware of any that
14  exists.

15       **H.   Summary Exhibits**

16       To streamline the presentation of evidence for the jury, the
17  government intends to use charts to summarize claims submitted to
18  Medicare and checks sent by defendant ABRAMS received from hospices.

19       Charts and summaries of evidence are governed by Federal Rule of
20  Evidence 1006, which permits the introduction of charts, summaries,
21  or calculations of voluminous writings, recordings, or photographs
22  which cannot conveniently be examined in court.  See Fed. R. Evid.
23  1006.  Accordingly, a summary chart may be admitted as substantive
24  evidence when the proponent establishes that the underlying documents
25
26  _____
27       [14] During a meet and confer on November 26, 2024, counsel for
    defendant ABRAMS argued that there is no prohibition on a witness
    stating that she told a defendant to do something and why, provided
28  it is relevant to the offense charged.  The government disagrees with
    this position and respectfully submits this is inadmissible hearsay.

1  upon which the summary is based are voluminous, admissible, and

2  available for inspection.  Id; see also United States v. Meyers, 847

3  F.2d 1408, 1412 (9th Cir. 1988).  All that is required for the rule

4  to apply is that the underlying writings be voluminous and that in-

5  court examination not be convenient.  United States v. Scales, 594

6  F.2d 558, 562 (6th Cir. 1979) (admitting charts summarizing charges

7  in indictment and overt acts evidencing conspiracy charge).  Although

8  the materials underlying the summary must be "admissible," they need

9  not themselves be "admitted" into evidence.  Meyers, 847 F.2d at

10  1412.

11       In addition, the summary chart must be accurate, authentic, and

12  properly introduced.  Scales, 594 F.2d at 563.  Where a chart does

13  not contain complicated calculations that would require an expert for

14  accuracy, authentication of the chart requires only that the witness

15  (1) have properly catalogued the exhibits and records upon which the

16  chart is based and (2) have knowledge of the analysis of the records

17  referred to in the chart.  Id.  Neither of these requirements

18  necessitates any special expertise.  Id.  The person who supervises

19  the compilation of the summary chart is the proper person to attest

20  to its authenticity and accuracy.  Id.  In addition, summary charts

21  may be used by the government in its opening statement.  See United

22  States v. De Peri, 778 F.2d 963, 979 (3d Cir. 1985) (approving

23  government's use of chart); United States v. Rubino, 431 F.2d 284,

24  289-90 (6th Cir. 1970) (same).

25       Also, apart from Rule 1006, a summary of evidence may be

26  presented to the jury with proper limiting instructions.  Rule 611(a)

27  recognizes that the trial court must "exercise reasonable control

28  over the mode and order of examining witnesses and presenting

26

1   evidence so as to: (1) make those procedures effective for
2   determining the truth; [and] (2) avoid wasting time . . . ."  Fed. R.
3   Evid. 611(a); see also United States v. Gardner, 611 F.2d 770, 776
4   (9th Cir. 1980) (in tax case, use of chart summarizing defendant's
5   assets, liabilities, and expenditures "contributed to the clarity of
6   the presentation to the jury, avoided needless consumption of time
7   and was a reasonable method of presenting the evidence").

8   **I.    Cross-Examination of Defendant**

9        A defendant who testifies at trial waives his right against
10  self-incrimination and subjects himself to cross-examination
11  concerning all matters reasonably related to the subject matter of
12  his testimony.  The scope of defendant's waiver is coextensive with
13  the scope of relevant cross-examination.  United States v. Cuozzo,
14  962 F.2d 945, 948 (9th Cir. 1992); United States v. Black, 767 F.2d
15  1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on
16  direct does not determine the extent of permissible cross-examination
17  or his waiver.  Rather, the inquiry is whether 'the government's
18  questions are reasonably related' to the subjects covered by the
19  defendant's testimony").  Additionally, Fed. R. Evid. 404(b) does not
20  proscribe the use of other act evidence as an impeachment tool during
21  cross-examination.  United States v. Gay, 967 F.2d 322 (9th Cir.
22  1992).

23       Here, defendant ABRAMS provided information to the government on
24  or about April 20, 2022, and May 16, 2022, subject to a proffer
25  agreement.  The proffer agreement generally prohibits the government
26  from offering evidence it its case-in-chief statements made by
27  defendant ABRAMS during these two meetings.  The proffer agreement,
28  however, allows the government to "[u]se statements made by [Mr.

27

Wallach] or [Mr. Abrams] at the meeting and all evidence obtained directly or indirectly from those statements for the purpose of cross-examination should [Mr. Abrams] testify, or to refute or counter at any stage of the proceedings (including this Office's case-in-chief at trial) any evidence, argument, statement or representation offered by or on behalf of [Mr. Abrams] in correction with any proceeding[.]"

### J.   Asset Forfeiture

The government alleged one forfeiture allegation against defendant PALMA under 18 U.S.C. § 982(a)(7).  If the government secures a conviction against defendant PALMA for any of Counts One through Twelve, it intends to seek the appropriate forfeiture order(s), including but not limited to a money judgment of forfeiture order against defendant PALMA at or prior to sentencing.

### K.   Reciprocal Discovery

Rule 16 of the Federal Rules of Criminal Procedure creates certain reciprocal discovery obligations on the part of defendants to produce three categories of materials that he intends to introduce as evidence at trial: (1) documents and tangible objects; (2) reports of any examinations or tests; and (3) expert witness disclosure.  Rule 16 imposes on defendant a continuing duty to disclose these categories of materials.  Fed. R. Crim. P. 16(b)(1)(A), (b)(1)(C), and (c).  In those circumstances where a party fails to produce discovery as required by Rule 16, the rule empowers the district court to "prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."

The Ninth Circuit has held that where a defendant fails to produce reciprocal discovery, it is well within the district court's discretion to exclude such defense evidence, especially where the defense disclosure was made after the start of trial.  See United States v. Aceves-Rosales, 832 F.2d 1155, 1156-57 (9th Cir. 1987); United States v. Scholl, 166 F.3d 964, 972 (9th Cir. 1999); United States v. Nash, 115 F.3d 1431, 1439-40 (9th Cir. 1997).

**VII. CONCLUSION**

The government respectfully requests leave to supplement this Trial Memorandum, as appropriate.

**<u>APPENDIX A: Joint Trial Witness Time Estimate Form</u>**

United States v. Nita Palma and Percy Abrams
No. 2:20-CR-536-DMG                                           December 3, 2024
Case                                                         Trial Date

| | WITNESS NAME | PARTY CALLING WITNESS AND ESTIMATE | X-EXAMINER'S ESTIMATE | DESCRIPTION OF TESTIMONY | COMMENTS |
|---|---|---|---|---|---|
| 1. | Adeyemo, Mogbonjubola | Government 0.5 | Palma  0.5<br>Abrams 0.5 | Doctor for J.P.G. (Count 5) | |
| 2. | Agarwal, Ashok | Government 0.5 | Palma  0.5<br>Abrams 0.5 | Doctor for M.D. (Count 1) | |
| 3. | Basco, Evelyn | Government 0.75 | Palma  0.25<br>Abrams 0.25 | Doctor at Palma's hospice | |
| 4. | Bernard, Niall<br>HHS-OIG Special Agent | Government 1.0 | Palma  0.25<br>Abrams 0.25 | Executed search warrant; spoke to Palma | |
| 5. | Boyd, William<br>Cal-DOJ Special Agent | Government 0.75 | Palma  1.0<br>Abrams 1.0 | Undercover meeting with Abrams | |
| 6. | Coleman, Stacey<br>Qlarant | Government 1.25 | Palma  0.5<br>Abrams 0.5 | Hospice & Medicare background | |
| 7. | Clark, Peter<br>HHS-OIG, Exclusions Team | Government 0.75 | Palma  0.5<br>Abrams 0.5 | Exclusions from Medicare and reinstatement | |
| 8. | D.J.C. | Government 0.5 | Palma  0.25<br>Abrams 0.25 | Beneficiary (Count 4) | |
| 9. | Demirozu, Mehmet | Government 0.5 | Palma  0.25<br>Abrams 0.25 | Doctor for T.N. (Counts 7, 12) | |
| 10. | Distasio, Christopher | Government 0.5 | Palma  0.25<br>Abrams 0.25 | Doctor for E.W. (Count 6) | |
| | TOTAL ESTIMATES THIS PAGE | 7.0 | 8.5 | | |

| | WITNESS NAME | PARTY CALLING WITNESS AND ESTIMATE | X-EXAMINER'S ESTIMATE | DESCRIPTION OF TESTIMONY | COMMENTS |
|---|---|---|---|---|---|
| 11. | Fernandez, Thelma | Government 0.75 | Palma  0.25 Abrams 0.25 | Doctor for A.H. (Counts 9-10) & S.H. (Counts 3,8) | |
| 12. | Gamayon, Esmeralda | Government 0.5 | Palma  0.25 Abrams 0.25 | Defendant Palma's niece, former hospice clerk | |
| 13. | J.P.G. | Government 0.75 | Palma  0.25 Abrams 0.25 | Beneficiary (Count 5) | |
| 14. | Gundry, Cheryl | Government 1.0 | Palma  0.25 Abrams 0.25 | Nursing director at Palma's hospice | |
| 15. | Kawashiri, David | Government 0.5 | Palma  0.25 Abrams 0.25 | Doctor for D.J.C. (Count 4) | |
| 16. | Linares, Daniel | Government 0.75 | Palma  0.25 Abrams 0.25 | Doctor at Palma's hospice | |
| 17. | W.M. | Government 0.5 | Palma  0.25 Abrams 0.25 | Beneficiary (Counts 2, 11) | |
| 18. | T.N. | Government 0.5 | Palma  0.5 Abrams 0.5 | Beneficiary (Counts 7, 12); Meeting with defendant Abrams | |
| 19. | Karapetyan, Goar | Government 0.5 | Palma  0.25 Abrams 0.25 | Sold hospice to Palma | may need interpreter |
| 20. | M.P. | Government 1.0 | Palma  0.25 Abrams 0.25 | Former marketer for Palma's hospice | |
| | TOTAL ESTIMATES THIS PAGE | 6.75 | 5.5 | | |

| | WITNESS NAME | PARTY CALLING WITNESS AND ESTIMATE | X-EXAMINER'S ESTIMATE | DESCRIPTION OF TESTIMONY | COMMENTS |
|---|---|---|---|---|---|
| 21. | Pham, Ronald | Government 0.75 | Palma  0.25<br>Abrams 0.25 | Doctor for W.M. (Counts 2, 11) | |
| 22. | Preuss, Joshua<br>HHS-OIG Special Agent | Government 2.0 | Palma  0.75<br>Abrams 0.75 | Executed search warrant, spoke with defendant Abrams, introduce records | |
| 23. | Subadya, Andreas | Government 0.75 | Palma  0.25<br>Abrams 0.25 | Doctor at Palma's hospice | |
| 24. | Vargas, Michelle | Government 1.0 | Palma  0.25<br>Abrams 0.25 | Straw owner of Palma's hospice | |
| 25. | Villespin, Cora | Government 0.5 | Palma  0.25<br>Abrams 0.25 | Office manager for Palma's hospice | |
| | TOTAL ESTIMATES THIS PAGE | 5.0 | 3.5 | | |

3